**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED

MAR - 5 2019

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| |
|---|
| UNITED STATES OF AMERICA, |
| Plaintiff, |
| v. |
| THALES S.A. and GEMALTO N.V., |
| Defendants. |

Case No.: *19 CV 569 (BAH)*

## STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

### I.    DEFINITIONS

As used in this Stipulation and Order:

A.    "Acquirer" means the entity to whom Defendants divest the Divestiture Assets.

B.    "Thales" means Defendant Thales S.A., a French corporation with its principal office in Paris, France; its successors and assigns; and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "Gemalto" means Defendant Gemalto N.V., a Netherlands corporation with its headquarters in Amsterdam; its successors and assigns; and its subsidiaries, divisions, groups,

affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

     D.     "Transaction" means Thales' acquisition of Gemalto through a public offer by Thales for all issued and outstanding ordinary shares of Gemalto pursuant to the Merger Agreement between Thales and Gemalto dated December 17, 2017.

     E.     "Defendants" means Thales and Gemalto, acting individually or collectively.

     F.     "Divestiture Assets" means Thales' GP HSM Products business, including:

     (1)    all tangible assets primarily related to the production, operation, research, development, sale, or support of any GP HSM Product, including but not limited to manufacturing equipment, tooling and fixed assets, computers, tapes, disks, other storage devices, other IT hardware, equipment used in research and development, testing equipment, tools used in design or simulation, personal property, inventory, office furniture, materials, supplies, and other tangible property;

     (2)    all Shared Intangible Assets; and

     (3)    all other intangible assets primarily related to the production, operation, research, development, sale, or support of any GP HSM Product, including but not limited to (i) licenses, permits, certifications, and authorizations issued by any governmental organization; contracts or portions of contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, including supply agreements; customer lists, histories, contracts, accounts, and credit records; repair and performance records; documentation relating to software development and changes; manuals and technical information Defendants provide to their own employees, customers, suppliers, agents, or licensees; data and records relating to

historic and current research and development efforts, including but not limited to designs of experiments and the results of successful and unsuccessful experiments; records relating to designs or simulations, safety procedures for the handling of materials and substances, and quality assurance and control procedures; and other records; and (ii) intellectual property rights, including but not limited to patents, licenses and sublicenses, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, and specifications for parts and devices (but not including the name "THALES" in any trademark, domain name, trade name, or service).

The Divestiture Assets include but are not limited to:  CodeSafe, nShield Remote Administration, nShield Bring Your Own Key, Key Authority (at the option of Acquirer), and Security World Architecture and monitoring tool nShield Monitor.  The Divestiture Assets do not include any assets owned by Gemalto prior to the closing of the Transaction.

G.    "Divestiture Closing Date" means the date on which Thales divests the Divestiture Assets to Acquirer.

H.    "GP HSM Product" means a hardened, tamper-resistant general purpose hardware security module and includes all add-ons, value-added features, and accessories.  "GP HSM Product" does not include the Vormetric Data Security Manager, but does include any GP HSM Product that is incorporated into or otherwise used with the Vormetric Data Security Manager

I.    "Relevant Personnel" means all Thales employees who have supported or whose job related to the Divestiture Assets at any time between July 1, 2017 and the Divestiture Closing Date.

3

J.    "Shared Intangible Assets" means intangible assets that are used, or have been under development for use as of January 7, 2019, in relation to (i) Thales' GP HSM Products business and (ii) Thales' business relating to products other than GP HSM Products.

## II.    OBJECTIVES

The Final Judgment filed in this case is meant to ensure Defendants' prompt divestiture of the Divestiture Assets for the purpose of establishing a viable competitor in the GP HSM Products business in order to remedy the effects that the United States alleges would otherwise result from the Transaction.  This Stipulation and Order ensures, prior to such divestiture, that the Divestiture Assets remain an independent, economically viable, and ongoing business concern that will remain independent and uninfluenced by Defendants, and that competition is maintained during the pendency of the ordered divestiture.

## III.    JURISDICTION AND VENUE

The Court has jurisdiction over the subject matter of this action and over each of the parties hereto, and venue of this action is proper in the United States District Court for the District of Columbia.

## IV.    COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on Defendants and by filing

that notice with the Court. Defendants agree to arrange, at their expense, publication as quickly as possible of the newspaper notice required by the APPA, which shall be drafted by the United States in its sole discretion. The publication shall be arranged no later than three (3) business days after Defendants' receipt from the United States of the text of the notice and the identity of the newspaper within which the publication shall be made. Defendants shall promptly send to the United States (1) confirmation that publication of the newspaper notice has been arranged, and (2) the certification of the publication prepared by the newspaper within which the notice was published.

B.      Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment. The United States shall have the full rights and enforcement powers in the proposed Final Judgment, including Section XII (Compliance Inspection), as though the same were in full force and effect as the final order of the Court.

C.      Defendants shall not consummate the Transaction before the Court has signed this Stipulation and Order.

D.      This Stipulation and Order shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.      In the event (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation and Order, the time has expired for all appeals of any Court ruling declining entry of

the proposed Final Judgment, and the Court has not otherwise ordered continued compliance

with the terms and provisions of the proposed Final Judgment, then the parties are released from

all further obligations under this Stipulation and Order, and the making of this Stipulation and

Order shall be without prejudice to any party in this or any other proceeding.

F.     Defendants represent that the divestitures ordered in the proposed Final Judgment

can and will be made, and that Defendants will later raise no claim of mistake, hardship or

difficulty of compliance as grounds for asking the Court to modify any of the provisions

contained therein.

## V.     HOLD SEPARATE AND ASSET PRESERVATION PROVISIONS

Until the Divestiture Closing Date:

A.     Defendants shall preserve, maintain, and continue to operate the Divestiture

Assets as an independent, ongoing, economically viable and competitive business, with

management, sales, and operations of such assets held entirely separate, distinct, and apart from

those of Defendants' other operations.  Defendants shall not coordinate their production,

marketing, or terms of sale or service of any products with those produced by or sold under any

of the Divestiture Assets.  Within twenty (20) days after the entry of the Stipulation and Order,

Defendants will inform the United States of the steps Defendants have taken to comply with this

Stipulation and Order.

B.     Defendants shall take all steps necessary to ensure that (1) the Divestiture Assets

will be maintained and operated as an independent, ongoing, economically viable, and active

competitor in the GP HSM Products business; (2) management of the Divestiture Assets will not

be influenced by Defendants; and (3) the books, records, competitively sensitive sales, marketing

and pricing information, and decision-making concerning production, operation, research, development, sale, and support of products by or under any of the Divestiture Assets will be kept separate and apart from Defendants' other operations except as otherwise permitted by Paragraph XI(A) of the Proposed Final Judgment.

C.    Defendants shall use all reasonable efforts to maintain and increase the sales, service, and revenues of the products produced by or sold under Divestiture Assets, and shall maintain at 2018 or previously approved levels for 2019, whichever are higher, all promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Divestiture Assets.

D.    Defendants shall provide sufficient working capital and lines and sources of credit to continue to maintain the Divestiture Assets as an economically viable and competitive, ongoing business, consistent with the requirements of Paragraphs V(A) and (B).

E.    Defendants shall take all steps necessary to ensure that the Divestiture Assets are fully maintained in operable condition at no less than their current capacity and sales, and shall maintain and adhere to normal repair and maintenance schedules for the Divestiture Assets.

F.    Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Divestiture Assets.

G.    Defendants shall maintain, in accordance with sound accounting principles, separate, accurate and complete financial ledgers, books and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of the Divestiture Assets.

H.    Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets.

I.    Defendants' employees with primary responsibility for the management, research and development, production, operation, distribution, sale, and servicing of products by or under the Divestiture Assets shall not be transferred or reassigned to other areas within Defendants except for transfer bids initiated by employees pursuant to Defendants' regular, established job posting policy.  Defendants shall provide the United States with ten (10) calendar days' notice of any such transfer.

J.    Defendants shall appoint a person or persons to oversee the Divestiture Assets, and who will be responsible for Defendants' compliance with this section.  This person shall have complete, independent managerial responsibility for the Divestiture Assets, subject to the provisions of this Final Judgment, and shall make all business decisions relating to the operations of the Divestiture Assets, including but not limited to all research and development, sales, pricing, marketing, bidding, discounting, and servicing decisions.  In the event such person is unable to perform her or his duties, Defendants shall appoint, subject to the approval of the United States, a replacement within ten (10) working days.  Should Defendants fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

K.    Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer acceptable to the United States.

## VI.    DURATION OF HOLD SEPARATE AND ASSET PRESERVATION OBLIGATIONS

Defendants' obligations under Section V of this Stipulation and Order shall remain in effect until (1) the Divestiture Closing Date or (2) until further order of the Court.  If the United States voluntarily dismisses the Complaint in this matter, Defendants are released from all further obligations under this Stipulation and Order.

Dated: February 28, 2019

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA

Kelly Schoolmeester
United States Department of Justice
Antitrust Division, Technology and Financial Services Section
450 Fifth Street, N.W., Suite 7100
Washington, D.C. 20530
Phone: (202) 598-2693
Fax: (202) 616-8544
Email: kelly.schoolmeester@usdoj.gov

FOR DEFENDANT THALES S.A.

Elaine Ewing
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Phone: (202) 974-1668
Email: eewing@cgsh.com

FOR DEFENDANT GEMALTO N.V.

Daniel L. Wellington
Norton Rose Fulbright US LLP
799 9th Street, N.W., Suite 1000
Washington, D.C. 20001
Phone: (202) 662-4574
Email: dan.wellington@nortonrosefulbright.com

10

## ORDER

IT IS SO ORDERED by the Court, this 5th day of March, 2019.

_____
United States District Judge

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THALES S.A. and GEMALTO N.V.,<br><br>Defendants. | Case No.: |

## PROPOSED FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on February 28, 2019, the United States and Defendants, Thales S.A. and Gemalto N.V., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.    DEFINITIONS

As used in this Final Judgment:

A.     "Acquirer" means the entity to whom Defendants divest the Divestiture Assets.

B.     "Thales" means Defendant Thales S.A., a French corporation with its principal office in Paris, France; its successors and assigns; and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.     "Gemalto" means Defendant Gemalto N.V., a Netherlands corporation with its headquarters in Amsterdam; its successors and assigns; and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

2

D.     "Defendants" means Thales and Gemalto, acting individually or collectively.

E.     "Transaction" means Thales' acquisition of Gemalto through a public offer by Thales for all issued and outstanding ordinary shares of Gemalto pursuant to the Merger Agreement between Thales and Gemalto dated December 17, 2017.

F.     "Confidential Information" means non-public information related to the Divestiture Assets.

G.     "Divestiture Assets" means Thales' GP HSM Products business, including:

(1)   all tangible assets primarily related to the production, operation, research, development, sale, or support of any GP HSM Product, including but not limited to manufacturing equipment, tooling and fixed assets, computers, tapes, disks, other storage devices, other IT hardware, equipment used in research and development, testing equipment, tools used in design or simulation, personal property, inventory, office furniture, materials, supplies, and other tangible property;

(2)   all Shared Intangible Assets; and

(3)   all other intangible assets primarily related to the production, operation, research, development, sale, or support of any GP HSM Product, including but not limited to (i) licenses, permits, certifications, and authorizations issued by any governmental organization; contracts or portions of contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, including supply agreements; customer lists, histories, contracts, accounts, and credit records; repair and performance records; documentation relating to software development and changes; manuals and technical information Defendants provide to their own employees, customers, suppliers, agents, or licensees; data and records relating to

historic and current research and development efforts, including but not limited to designs of experiments and the results of successful and unsuccessful experiments; records relating to designs or simulations, safety procedures for the handling of materials and substances, and quality assurance and control procedures; and other records; and (ii) intellectual property rights, including but not limited to patents, licenses and sublicenses, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, and specifications for parts and devices (but not including the name "THALES" in any trademark, domain name, trade name, or service).

The Divestiture Assets include but are not limited to:  CodeSafe, nShield Remote Administration, nShield Bring Your Own Key, Key Authority (at the option of Acquirer), and Security World Architecture and monitoring tool nShield Monitor.  The Divestiture Assets do not include any assets owned by Gemalto prior to the closing of the Transaction.

H.    "Divestiture Closing Date" means the date on which Thales divests the Divestiture Assets to Acquirer.

I.    "GP HSM Product" means a hardened, tamper-resistant general purpose hardware security module and includes all add-ons, value-added features, and accessories.  "GP HSM Product" does not include the Vormetric Data Security Manager, but does include any GP HSM Product that is incorporated into or otherwise used with the Vormetric Data Security Manager.

J.    "Regulatory Approvals" means any approvals or clearances pursuant to filings with the Committee on Foreign Investments in the United States ("CFIUS"), or under antitrust,

competition, or other U.S. or international laws in connection with Acquirer's acquisition of the Divestiture Assets.

K.      "Relevant Personnel" means all Thales employees who have supported or whose job related to the Divestiture Assets at any time between July 1, 2017 and the Divestiture Closing Date.

L.      "Retained Solution" means any solution that is sold by Defendants, including but not limited to Vormetric Data Security Manager, Vormetric Transparent Encryption, CipherTrust Cloud Key Manager, SafeNet KeySecure, SafeNet Virtual KeySecure, SafeNet ProtectApp, and any upgrades, revisions, or new versions of any such solutions, in each case solely to the extent such solution has interfaced or interoperated with any of the Divestiture Assets at any time since January 1, 2017.

M.      "Shared Intangible Assets" means intangible assets that are used, or have been under development for use as of January 7, 2019, in relation to (i) Thales' GP HSM Products business and (ii) Thales' business relating to products other than GP HSM Products.

### III.    APPLICABILITY

A.      This Final Judgment applies to Thales and Gemalto, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Section IV and Section V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, Defendants shall require the purchaser to be bound by

the provisions of this Final Judgment.  Defendants need not obtain such an agreement from the acquirer of the assets divested pursuant to this Final Judgment.

## IV.    DIVESTITURES

A.    Defendants are ordered and directed, within thirty-five (35) calendar days following the signing by the parties of the Stipulation and Order in this matter or five (5) calendar days after the notice of entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets to Acquirer in a manner consistent with this Final Judgment.  The United States, in its sole discretion, may agree to one or more extensions of this time period and shall notify the Court in such circumstances.  If Acquirer, and/or Defendants, as applicable, have initiated contact with any governmental unit to seek any Regulatory Approval within five (5) calendar days after the United States provides written notice pursuant to Paragraph VI(C) that it does not object to the proposed Acquirer, the period shall be extended (if necessary) until fifteen (15) calendar days after such Regulatory Approval is received.  The extension allowed for Regulatory Approvals shall be no longer than ninety (90) calendar days, unless further extended by the United States, in its sole discretion.  Nothing in this section shall require Defendants to divest the Divestiture Assets earlier than five (5) calendar days after the closing of the Transaction.  Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B.    For Divestiture Assets that are Shared Intangible Assets, the divestiture shall be completed in the following manner:

(1)    For each Shared Intangible Asset listed on Schedule 1 and any other Shared Intangible Asset that has been used, or has been under development for use, primarily in relation

6

to Thales' GP HSM Products business, Thales shall transfer or otherwise assign to Acquirer all of Thales' ownership interest or other rights in the Shared Intangible Asset, and (a) for any asset listed on Schedule 1, Acquirer shall provide Defendants a non-exclusive, perpetual, worldwide, fully paid-up license to use (or, at the Acquirer's option, a covenant not to sue Defendants for using) the asset in the manner specified on Schedule 1, and (b) for any other Shared Intangible Asset transferred to Acquirer under this paragraph, Acquirer shall provide Defendants a non-exclusive, perpetual, worldwide, fully paid-up license to use (or, at the Acquirer's option, a covenant not to sue Defendants for using) the asset in the manner in which it is currently used, or currently under development for use, in relation to any Thales product other than GP HSM Products.

(2)    For each Shared Intangible Asset listed on Schedule 2 and any other Shared Intangible Asset that has been used, or has been under development for use, primarily in relation to Thales' business relating to products other than GP HSM Products, Defendants shall provide Acquirer a, perpetual, worldwide, fully paid-up license to use (or, at the Acquirer's option, a covenant not to sue Acquirer for use of) the asset.  At the Acquirer's option, such licenses shall (i) be exclusive in relation to GP HSM Products and/or (ii) include non-exclusive rights in relation to products other than GP HSM products.

C.    In accomplishing the divestiture ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making an inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all

7

prospective Acquirers, subject to customary confidentiality assurances, all information and

documents relating to the Divestiture Assets customarily provided in a due diligence process,

except information or documents subject to the attorney-client privilege or work-product

doctrine. Defendants shall make available such information to the United States at the same time

that such information is made available to any other person.

        D.      Defendants shall permit prospective Acquirers of the Divestiture Assets to have

reasonable access to personnel and to make inspections of the physical facilities included in the

Divestiture Assets; access to any and all environmental, zoning, and other permit documents and

information; and access to any and all financial, operational, or other documents and information

customarily provided as part of a due diligence process.

        E.      Defendants shall not take any action that will impede in any way the permitting,

operation, or divestiture of the Divestiture Assets.

        F.      **Employees**

        (1)    Within ten (10) business days following the filing of the Complaint in this

matter, Thales shall provide to Acquirer, the United States, and the Monitoring Trustee

organization charts including any Relevant Personnel for each year since July 1, 2017. Within

ten (10) business days of receiving a request from Acquirer, Thales shall provide, subject to

applicable law, to Acquirer, the United States, and the Monitoring Trustee, additional

information related to identified Relevant Personnel, including name, job title, reporting

relationships, past experience, and responsibilities from July 1, 2017 through the Divestiture

Closing Date, training and educational history, relevant certifications, job performance

evaluations, and current salary and benefits information to enable Acquirer to make offers of employment.

(2)    Upon request by the Acquirer, Thales shall make Relevant Personnel available for interviews with Acquirer during normal business hours at a mutually agreeable location.  Defendants will not interfere with any negotiations by Acquirer to employ any Relevant Personnel.  Interference includes but is not limited to offering to increase the salary or benefits of Relevant Personnel other than as part of an increase in salary or benefits granted in the ordinary course of business.

(3)    For any Relevant Personnel who elect employment with Acquirer as part of the divestiture required by this Final Judgment, or pursuant to Paragraph IV(F)(7) of this Final Judgment, Thales shall waive all non-compete and non-disclosure agreements (except as noted in Paragraph IV(F)(6)), vest all unvested pension and other equity rights, and provide all benefits which those Relevant Personnel would be provided if transferred to a buyer of an ongoing business.

(4)    For a period of two (2) years from the Divestiture Closing Date, Thales may not solicit to hire Relevant Personnel who were hired by Acquirer as part of the divestiture required by this Final Judgment, or pursuant to Paragraph IV(F)(7) of this Final Judgment, unless (a) such individual is terminated or laid off by Acquirer or (b) Acquirer agrees in writing that Thales may solicit or hire that individual; provided, however, that nothing in this paragraph shall be construed as prohibiting Defendants from utilizing general solicitations or advertisements.

(5)    For a period of one (1) year from the Divestiture Closing Date, Thales may not hire Relevant Personnel who were hired by Acquirer as part of the divestiture pursuant to this

9

Final Judgment or pursuant to Paragraph IV(F)(7) of this Final Judgment, unless (a) such individual is terminated or laid off by Acquirer or (b) Acquirer agrees in writing that Thales may solicit or hire that individual.

        (6)    Nothing in Paragraph IV(F) shall prohibit Thales from maintaining any reasonable restrictions on the disclosure by any employee who accepts an offer of employment with Acquirer of Thales' proprietary non-public information that is (a) not otherwise required to be disclosed by this Final Judgment, (b) related solely to Thales' retained businesses and clients, and (c) unrelated to the Divestiture Assets.

        (7)    Acquirer's right to hire Relevant Personnel pursuant to Paragraph IV(F)(2) and Thales' obligations under Paragraph IV(F)(3) shall remain in effect for a period of ninety (90) days after the Divestiture Closing Date.

        G.    **Asset Warranties**

In addition to any other warranties in the divestiture-related agreements entered into by Defendants, Thales shall warrant to Acquirer (a) that each asset will be operational and without material defect as of the Divestiture Closing Date; (b) that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets; and (c) that, following the sale of the Divestiture Assets, Defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

        H.    **Additional Assets**

In addition to any other remedial provisions in the divestiture-related agreements entered into by Defendants, for a period of up to one (1) year following the Divestiture Closing Date, if

10

Acquirer determines that any assets not included in the Divestiture Assets were related to the GP HSM Products business and reasonably necessary for the continued competitiveness of the divested GP HSM Products business, it shall notify the United States, the Monitoring Trustee, and the Defendants in writing that it requires such assets. If, after taking into account Acquirer's assets and business and providing Defendants an opportunity to demonstrate that such assets were not related to, and/or not reasonably necessary for the continued competitiveness of the divested GP HSM Products business, the United States, in its sole discretion, determines that such assets should be transferred or licensed, Defendants and Acquirer will negotiate an agreement within thirty (30) calendar days providing for the transfer or licensing of such assets in a period to be determined by the United States in consultation with the Defendants. The terms of any such transfer or license agreement shall be commercially reasonable and must be acceptable to the United States, in its sole discretion.

I.      **Transition Services**

At the option of Acquirer, on or before the Divestiture Closing Date, Thales shall enter into transition services or reverse transition services agreements to provide any transition services reasonably necessary to allow Acquirer to operate any Divestiture Assets or to facilitate the transfer of Thales facilities to Acquirer. Thales will provide transition services under any such agreement for an initial period of up to one (1) year, on terms and conditions reasonably related to market conditions for the provision of the relevant services, subject to the approval of the United States in its sole discretion. Upon Acquirer's request, the United States, in its sole discretion, may approve one or more extensions of any such agreement for a total of up to an additional one (1) year.

J.    **Third-Party Agreements**

At Acquirer's option, on or before the Divestiture Closing Date, Thales shall use its best efforts to assign or otherwise transfer to Acquirer all transferable or assignable agreements, or any assignable portions thereof, included in the Divestiture Assets, including but not limited to customer contracts, licenses, and collaborations.  If Thales is unable to assign or transfer any such agreements, Thales shall use best efforts to ensure that Acquirer is put in the same economic position as if such agreements were assigned or transferred to Acquirer on the Divestiture Closing Date.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for the provision of such services.

K.    **Licenses, Registrations, and Permits**

Thales will make best efforts to assist Acquirer with acquiring new licenses, registrations, and permits to support the Divestiture Assets and, until Acquirer has the necessary licenses, registrations, and permits, Thales will provide Acquirer with the benefit of Thales' licenses, registrations, and permits in Acquirer's operation of the Divestiture Assets to the extent permissible by law.

L.    **Interoperability**

(1)    In order for the Divestiture Assets to have the uninterrupted ability to interface and interoperate with any solution that is provided by Defendants, for two (2) years following the date of sale of the Divestiture Assets, Defendants shall continue to enable, at cost and on the same quality and terms, the interface and interoperation between any GP HSM Product offered by Acquirer using the Divested Assets and any Retained Solutions to the extent

12

such interface or interoperation existed at any time since January 1, 2017 in the then-current

release of that Retained Solution.  Defendants shall, upon receiving a written request from

Acquirer at least thirty (30) calendar days before expiration of the second year, continue to

provide the capability covered by this Section for another one (1) year, if approved by the United

States in its sole discretion.

       (2)    Defendants may impose, as a condition of enabling any interface and

interoperation that is required by Paragraph IV(L)(1), conditions that are reasonably related to

maintaining the security, integrity, and confidentiality of customer data or the composition or

means of operation of the applicable Retained Solution, except that Defendants may not impose

conditions that are materially less favorable than the conditions under which Defendants provide

or would provide an interface and interoperation between any of Defendants' GP HSMs and any

Retained Solution.

       (3)    Defendants shall not change, during the period of Defendants' obligations

under Paragraph IV(L)(1), except for good cause, the format of any

interface and interoperation that is required by Paragraph IV(L)(1).  For any such change,

Defendants shall provide adequate notice and information for Acquirer to modify its Divested

Assets, including any such products that are already installed with customers, to use the new

format without disruption.

       (4)    Defendants shall take all reasonable steps to cooperate with and assist

Acquirer in obtaining any third-party license or permission that may be required for Defendants

to convey, license, sublicense, assign, or otherwise transfer to Acquirer rights, any interface or

interoperability required by Paragraph IV(L)(1), or the use of any data transmitted as a result of any such interface or interoperation.

    M.   **Patents**

    Thales shall provide a worldwide, non-exclusive, irrevocable, perpetual covenant not to assert against Acquirer or its customers in the field of use of GP HSM Products all U.S. or international patents, patent applications, or rights related to a patent or patent application (e.g., continuation, continuation-in-part, divisional, counterpart foreign application, or related international patent application filed under the Patent Cooperation Treaty), with a priority date or invention date prior to the closing of the Transaction (a) related to the Divestiture Assets and (b) owned, controlled, licensed, or used by Thales prior to the closing of the Transaction.

    N.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV or by the Divestiture Trustee appointed pursuant to Section V of this Final Judgment shall include the entire Divestiture Assets and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by Acquirer (approval of which is in the United States' sole discretion) as part of a viable, ongoing business of the production, operation, research, development, sale, and support of the GP HSM Products. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

        (1)    shall be made to an Acquirer that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) of competing effectively in the business of producing, operating, researching, developing, selling, and supporting GP HSM Products; and

        (2)    shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and Defendants give Defendants the ability unreasonably to raise the

14

Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V.    APPOINTMENT OF DIVESTITURE TRUSTEE

A.    If Defendants have not divested the Divestiture Assets to Acquirer within the time period specified in Paragraph IV(A), Defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a Divestiture Trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.    After the appointment of a Divestiture Trustee becomes effective, only the Divestiture Trustee shall have the right to sell the Divestiture Assets. The Divestiture Trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States, in its sole discretion, at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee, subject to the provisions of Sections IV and V of this Final Judgment, and shall have such other powers as the Court deems appropriate. Subject to Paragraph V(D) of this Final Judgment, the Divestiture Trustee may hire at the cost and expense of Defendants any agents, investment bankers, attorneys, accountants, or consultants, who shall be solely accountable to the Divestiture Trustee, reasonably necessary in the Divestiture Trustee's judgment to assist in the divestiture. Any such agents or consultants shall serve on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications.

C.    Defendants shall not object to a sale by the Divestiture Trustee on any ground other than the Divestiture Trustee's malfeasance. Any such objections by Defendants must be

conveyed in writing to the United States and the Divestiture Trustee within ten (10) calendar days after the Divestiture Trustee has provided the notice required under Section VI.

      D.     The Divestiture Trustee shall serve at the cost and expense of Defendants pursuant to a written agreement, on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications. The Divestiture Trustee shall account for all monies derived from the sale of the assets sold by the Divestiture Trustee and all costs and expenses so incurred. After approval by the Court of the Divestiture Trustee's accounting, including fees for any of its services yet unpaid and those of any professionals and agents retained by the Divestiture Trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the Divestiture Trustee and any professionals and agents retained by the Divestiture Trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement that provides the Divestiture Trustee with incentives based on the price and terms of the divestiture and the speed with which it is accomplished, but the timeliness of the divestiture is paramount. If the Divestiture Trustee and Defendants are unable to reach agreement on the Divestiture Trustee's or any agents' or consultants' compensation or other terms and conditions of engagement within fourteen (14) calendar days of the appointment of the Divestiture Trustee, the United States may, in its sole discretion, take appropriate action, including making a recommendation to the Court. The Divestiture Trustee shall, within three (3) business days of hiring any other agents or consultants, provide written notice of such hiring and the rate of compensation to Defendants and the United States.

E.      Defendants shall use their best efforts to assist the Divestiture Trustee in accomplishing the required divestiture.  The Divestiture Trustee and any agents or consultants retained by the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall provide or develop financial and other information relevant to such business as the Divestiture Trustee may reasonably request, subject to reasonable protection for trade secrets; other confidential research, development, or commercial information; or any applicable privileges.  Defendants shall take no action to interfere with or to impede the Divestiture Trustee's accomplishment of the divestiture.

F.      After its appointment, the Divestiture Trustee shall file monthly reports with the United States and, as appropriate, the Court, setting forth the Divestiture Trustee's efforts to accomplish the divestiture ordered under this Final Judgment.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture Assets and shall describe in detail each contact with any such person.  The Divestiture Trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the Divestiture Trustee has not accomplished the divestiture ordered under this Final Judgment within six (6) months after its appointment, the Divestiture Trustee shall promptly file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish the required divestiture; (2) the reasons, in the Divestiture Trustee's judgment, why

17

the required divestiture has not been accomplished; and (3) the Divestiture Trustee's

recommendations.  To the extent such reports contain information that the Divestiture Trustee

deems confidential, such reports shall not be filed in the public docket of the Court.  The

Divestiture Trustee shall at the same time furnish such report to the United States, which shall

have the right to make additional recommendations consistent with the purpose of the trust.  The

Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of

the Final Judgment, which may, if necessary, include extending the trust and the term of the

Divestiture Trustee's appointment by a period requested by the United States.

       H.     If the United States determines that the Divestiture Trustee has ceased to act or

failed to act diligently or in a reasonably cost-effective manner, the United States may

recommend the Court appoint a substitute Divestiture Trustee.

## VI.   NOTICE OF PROPOSED DIVESTITURE

       A.     Within two (2) business days following execution of a definitive divestiture

agreement, Defendants or the Divestiture Trustee, whichever is then responsible for effecting the

divestiture required herein, shall notify the United States of any proposed divestiture required by

Section IV or Section V of this Final Judgment.  If the Divestiture Trustee is responsible, it shall

similarly notify Defendants.  The notice shall set forth the details of the proposed divestiture and

list the name, address, and telephone number of each person not previously identified who

offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture

Assets, together with full details of the same.

       B.     Within fifteen (15) calendar days of receipt by the United States of such notice,

the United States may request from Defendants, the proposed Acquirer(s), any other third party,

or the Divestiture Trustee, if applicable, additional information concerning the proposed

divestiture, the proposed Acquirer(s), and any other potential Acquirer.  Defendants and the

Divestiture Trustee shall furnish any additional information requested within fifteen (15)

calendar days of the receipt of the request, unless the parties shall otherwise agree.

      C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20)

calendar days after the United States has been provided the additional information requested

from Defendants, the proposed Acquirer(s), any third party, and the Divestiture Trustee,

whichever is later, the United States shall provide written notice to Defendants and the

Divestiture Trustee, if there is one, stating whether or not, in its sole discretion, it objects to the

Acquirer or any other aspect of the proposed divestiture.  If the United States provides written

notice that it does not object, the divestiture may be consummated, subject only to Defendants'

limited right to object to the sale under Paragraph V(C) of this Final Judgment.  Absent written

notice that the United States does not object to the proposed Acquirer(s) or upon objection by the

United States, a divestiture proposed under Section IV or Section V shall not be consummated.

Upon objection by Defendants under Paragraph V(C), a divestiture proposed under Section V

shall not be consummated unless approved by the Court.

## VII.  FINANCING

      Neither Thales nor Gemalto shall finance all or any part of any purchase made

pursuant to this Final Judgment.

## VIII.   HOLD SEPARATE AND ASSET PRESERVATION

Until the divestiture required by this Final Judgment has been accomplished, Defendants shall take all steps necessary to comply with the Stipulation and Order entered by the Court. Defendants shall take no action that would jeopardize the divestiture ordered by the Court.

## IX.   AFFIDAVITS

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or Section V, Thales and Gemalto shall deliver to the United States an affidavit, signed by each defendant's Chief Financial Officer and General Counsel, which shall describe the fact and manner of Defendants' compliance with Section IV or Section V of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Thales and Gemalto, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.      Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States and the Monitoring Trustee an affidavit that

describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment.  Each of the Defendants shall deliver to the United States and the Monitoring Trustee an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this Section within fifteen (15) calendar days after the change is implemented.

      C.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one (1) year after such divestiture has been completed.

## X.    APPOINTMENT OF MONITORING TRUSTEE

      A.      Upon application of the United States, the Court shall appoint a Monitoring Trustee selected by the United States and approved by the Court.

      B.      The Monitoring Trustee shall have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Stipulation and Order entered by the Court and shall have such other powers as the Court deems appropriate. The Monitoring Trustee shall be required to investigate and report on the Defendants' compliance with this Final Judgment and the Stipulation and Order, and Defendants' progress toward effectuating the purposes of this Final Judgment, including but not limited to reviewing (1) the implementation and execution of the compliance plan required by Section XI, and (2) any applications by the Acquirer for additional employees or assets under Paragraphs IV(F) and IV(H) respectively.

      C.      Subject to Paragraph X(E) of this Final Judgment, the Monitoring Trustee may hire at the cost and expense of Defendants any agents, investment bankers, attorneys, accountants, or consultants, who shall be solely accountable to the Monitoring Trustee,

21

reasonably necessary in the Monitoring Trustee's judgment. Any such agents or consultants shall serve on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications.

D.     Defendants shall not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities under any Order of the Court on any ground other than the Monitoring Trustee's malfeasance. Any such objections by Defendants must be conveyed in writing to the United States and the Monitoring Trustee within ten (10) calendar days after the action taken by the Monitoring Trustee giving rise to Defendants' objection.

E.     The Monitoring Trustee shall serve at the cost and expense of Defendants, pursuant to a written agreement with Defendants and on such terms and conditions as the United States approves, including confidentiality requirements and conflict of interest certifications. The compensation of the Monitoring Trustee and any agents or consultants retained by the Monitoring Trustee shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the Monitoring Trustee and Defendants are unable to reach agreement on the Monitoring Trustee's or any agents' or consultants' compensation or other terms and conditions of engagement within fourteen (14) calendar days of the appointment of the Monitoring Trustee, the United States may, in its sole discretion, take appropriate action, including making a recommendation to the Court. The Monitoring Trustee shall, within three (3) business days of hiring any agents or consultants, provide written notice of such hiring and the rate of compensation to Defendants and the United States.

22

F.    The Monitoring Trustee shall have no responsibility or obligation for the operation of Defendants' businesses.

G.    Defendants shall use their best efforts to assist the Monitoring Trustee in monitoring Defendants' compliance with their individual obligations under this Final Judgment and under the Stipulation and Order. The Monitoring Trustee and any agents or consultants retained by the Monitoring Trustee shall have full and complete access to the personnel, books, records, and facilities relating to compliance with this Final Judgment, subject to reasonable protection for trade secrets; other confidential research, development, or commercial information; or any applicable privileges. Defendants shall take no action to interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

H.    After its appointment, the Monitoring Trustee shall file reports semiannually, or more frequently as needed, with the United States and, as appropriate, the Court setting forth Defendants' efforts to comply with Defendants' obligations under this Final Judgment and under the Stipulation and Order. To the extent such reports contain information that the Monitoring Trustee deems confidential, such reports shall not be filed in the public docket of the Court.

I.    The Monitoring Trustee shall serve until the divestiture of all the Divestiture Assets is finalized pursuant to either Section IV or Section V of this Final Judgment, any agreement entered into pursuant to Paragraph IV(I) has expired, and until Thales' obligations pursuant to Paragraphs IV(F) and IV(H) have concluded, unless the United States, in its sole discretion, terminates earlier or extends this period.

J.    If the United States determines that the Monitoring Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint a substitute Monitoring Trustee.

## XI.    PROTECTION OF CONFIDENTIAL INFORMATION

A.    Thales and Gemalto shall implement and maintain reasonable procedures to prevent the disclosure or use of Confidential Information for any purpose other than:

(1)    in connection with complying with this Final Judgment;

(2)    in connection with complying with regulatory, financial reporting, audit, legal, compliance, or similar administrative purposes; or

(3)    Defendants' use of Shared Intangible Assets as permitted by this Final Judgment.

B.    Any representative of Thales who possesses any Confidential Information shall disclose or use such information only to the extent necessary to perform activities authorized in Paragraph XI(A).

C.    Defendants shall implement procedures to prevent Confidential Information from being used or accessed by representatives of Defendants other than those with a need for such information in connection with the permitted uses set forth in Paragraph XI(A) (such procedures constituting a "compliance plan"). Defendants' compliance plan shall include identification of an individual with primary responsibility for implementing the compliance plan, monitoring adherence to the compliance plan, taking measures against individuals who fail to adhere to the compliance plan, and developing instruction materials and providing instruction to Defendants' representatives relating to their obligations under this Section.

24

D.    Defendants shall, within twenty (20) business days of the entry of the Stipulation and Order, submit to the United States and the Monitoring Trustee a document setting forth in detail the compliance plan.  Upon receipt of the document, the United States shall notify the Defendants within twenty (20) business days whether, in its sole discretion, it approves of or rejects the compliance plan.  In the event that the compliance plan is rejected, the United States shall provide the reasons for the rejection.  Defendants shall be given the opportunity to submit, within ten (10) business days of receiving a notice of rejection, a revised compliance plan.  If Defendants cannot agree with the United States on a compliance plan, the United States shall have the right to request that this Court rule on whether the Defendants' proposed compliance plan fulfills the requirements of Section XI.

E.    Defendants shall:

(1)    furnish a copy of this Final Judgment and related Competitive Impact Statement within five (5) business days of entry of the Final Judgment to (a) each officer, director, and any other employee who possesses, will possess, or may receive Confidential Information;

(2)    furnish a copy of this Final Judgment and related Competitive Impact Statement to any successor to a person designated in Paragraph XI(C) upon assuming that position;

(3)    annually brief each person designated in Paragraph XI(C) on the meaning and requirements of this Final Judgment and the antitrust laws; and

(4)    obtain from each person designated in Paragraph XI(C), within ten (10) business days of that person's receipt of the Final Judgment and annually thereafter for five (5)

25

years, a certification that he or she (a) has read and, to the best of his or her ability, understands and agrees to abide by the terms of this Final Judgment; (b) is not aware of any violation of the Final Judgment that has not been reported to the company; and (c) understands that any person's failure to comply with this Final Judgment may result in an enforcement action for civil or criminal contempt of court against each Defendant or any person who violates this Final Judgment; and

        (5)   six (6) months from the Divestiture Closing Date and annually thereafter for five (5) years, furnish an affidavit to the United States and the Monitoring Trustee, certifying compliance with Section XI.  For five (5) years following the Divestiture Closing Date, if violations of Section XI are found, affidavits describing such violations will be furnished to the United States and the Monitoring Trustee within five (5) days of the discovery of a violation.

        F.     The provisions of this Section shall expire five (5) years after the Divestiture Closing Date.

## XII.    COMPLIANCE INSPECTION

        A.     For the purposes of determining or securing compliance with this Final Judgment, or of any related orders such as any Stipulation and Order or of determining whether the Final Judgment should be modified or vacated, and subject to any legally-recognized privilege, from time to time authorized representatives of the United States, including the Monitoring Trustee or any other agents and consultants retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division and on reasonable notice to Defendants, be permitted:

(1)    access during Defendants' office hours to inspect and copy or, at the option of the United States, to require Defendants to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants relating to any matters contained in this Final Judgment; and

(2)    to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.    Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.    No information or documents obtained by the means provided in Section XI shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.    If at the time that Defendants furnish information or documents to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the

27

United States shall give Defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XIII.   NOTIFICATION OF FUTURE TRANSACTIONS

A.     Unless such transaction has a value less than $10 million or is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Defendants, without providing advance notification to the United States, shall not directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity, or management interest, in any company that researches, develops, or manufactures GP HSM Products during the term of this Final Judgment.

B.     Such notification shall be provided to the United States in the same format as, and per the instructions relating to, the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 8 of the instructions must be provided only about GP HSM Products and related services.  Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction.  If within the 30-day period after notification, representatives of the United States make a written request for additional information, Defendants shall not consummate the proposed transaction or agreement until thirty (30) calendar days after submitting all such additional information.  Early termination of the waiting periods in this Paragraph may be

28

requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. Section XIII shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under Section XII shall be resolved in favor of filing notice.

## XIV.     NO REACQUISITION OF DIVESTITURE ASSETS

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XV.     RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XVI.     ENFORCEMENT OF FINAL JUDGMENT

A.     The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. Defendants agree that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may establish a violation of the decree and the appropriateness of any remedy therefor by a preponderance of the evidence, and Defendants waive any argument that a different standard of proof should apply.

B.     The Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition the United States alleged was harmed

by the challenged conduct. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C.     In any enforcement proceeding in which the Court finds that Defendants have violated this Final Judgment, the United States may apply to the Court for a one-time extension of this Final Judgment, together with such other relief as may be appropriate. In connection with any successful effort by the United States to enforce this Final Judgment against a Defendant, whether litigated or resolved prior to litigation, that Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as any other costs including experts' fees, incurred in connection with that enforcement effort, including in the investigation of the potential violation.

## XVII.    EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry, except that after five (5) years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestitures have been completed and that the continuation of the Final Judgment no longer is necessary or in the public interest.

## XVIII.    PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, any comments thereon, and the United States' responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and responses to comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

[Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16]



_____

United States District Judge

## Schedule 1

## Shared Intangible Assets Transferred to Acquirer and Licensed Back to Defendants

In each case the "Field of Use for License-Back to Defendants" is limited to the manner in which the listed asset is currently used, or currently under development for use.

### *Patents*

| Title | Patent/Application No. | Jurisdiction | Field of Use for License-Back to Defendants |
|---|---|---|---|
| A method of data transfer, a method of controlling use of data and a cryptographic device | BR112018015254-4 | Brazil | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | 3013687 | Canada | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | 201780009864.1 | China | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | 17704057.3 | European Patent Office | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | 2018-540867 | Japan | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | PCT/GB2017/050264 | Patent Cooperation Treaty | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | 10-2018-7025706 | Republic of Korea | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | 1602088.5 | United Kingdom | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |
| A method of data transfer, a method of controlling use of data and a cryptographic device | 16/075575 | United States | (1) Payment HSMs and their derived applications and (2) encryption software products (not including key management) |

| Title | Patent/Application No. | Jurisdiction | Field of Use for License-Back to Defendants |
|---|---|---|---|
| A method and system of securely enforcing a computer policy | GB2413880 | United Kingdom | Payment HSMs and their derived applications. |
| Cryptographic security module method and apparatus | GB2409387 | United Kingdom | Payment HSMs and their derived applications. |
| Secure transmission of data within a distributed computer system | GB2404535 | United Kingdom | Encryption software products |
| Secure transmission of data within a distributed computer system | US7266705 | United States of America | Encryption software products |
| Controlling access to a resource by a program using a digital signature | CA2400940 | Canada | Payment HSMs and their derived applications. |
| Controlling access to a resource by a program using a digital signature | EP1257892 | Switzerland | Payment HSMs and their derived applications. |
| Controlling access to a resource by a program using a digital signature | EP1257892 | Germany | Payment HSMs and their derived applications. |
| Controlling access to a resource by a program using a digital signature | EP1257892 | France | Payment HSMs and their derived applications. |
| Controlling access to a resource by a program using a digital signature | EP1257892 | United Kingdom | Payment HSMs and their derived applications. |
| Controlling access to a resource by a program using a digital signature | EP1257892 | Ireland | Payment HSMs and their derived applications. |
| Controlling access to a resource by a program using a digital signature | US7900239 | United States of America | Payment HSMs and their derived applications. |

*Software*

| Category | Software | Field of Use for License-Back to Defendants |
|---|---|---|
| External API | SmartCards | Payment HSMs and their derived applications. |
| | TVD (Remote Admin) | Payment HSMs and their derived applications. |
| CodeSafe | CodeSafe v2 | Payment HSMs and their derived applications. |
| Remote Administration | JavaCard Applet | Payment HSMs and their derived applications. |
| Solo XC Source | security-processor | Payment HSMs and their derived applications. |
| | signing_infra | Payment HSMs and their derived applications. |

## Schedule 2

### Shared Intangible Assets Retained by Thales and Licensed to Acquirer

*Software*

| Category | Software |
|---|---|
| **Cipher Trust Monitor** | Cipher Trust Monitor common code |
| **TD & Fabric Activities** | Agate |
| | Augite |
| | Bauxite |
| | Cordierite |
| | Fabric core / Authorizer |
| | Fabric core / building-block-template |
| | Fabric core / crypto |
| | Fabric core / protector |
| | FIDO U2F |
| | Granite |
| | OpenID Connect Study |
| | Phenakite |
| | Pyrite |
| | TLS Token Binding Study |